(No. 35305.—

C. ORAN MENSIK *et al.*, Appellees, *vs.* ELBERT S. SMITH, Auditor of Public Accounts, *et al.*, Appellants.—(JOHN SELSKY *et al.*, Intervenors, Appellees.)

*Opinion filed January 22, 1960—Rehearing denied March 28, 1960.*

574

SCHAEFER and DAVIS, JJ., dissenting.

GRENVILLE BEARDSLEY, Attorney General, of Springfield, (BARNABAS F. SEARS, and WILLIAM S. BODMAN, both of Chicago, of counsel,) for appellants.

WILLIAM A. CUNNEA, and L. A. WESCOTT, both of Chicago, (JOHN A. BROWN, of counsel,) for appellees.

GEORGE S. LAVIN, and ROSENTHAL & SCHANFIELD, both of Chicago, (WILLIAM P. ROSENTHAL, LEONARD SCHAN-

FIELD, and MARSHALL G. FIELDS, of counsel,) for intervenor-appellees.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

The defendants, Elbert S. Smith as Auditor of Public Accounts of the State of Illinois and Conrad F. Becker as Director of Financial Institutions of the State, appeal directly to this court from a decree of the circuit court of Cook County enjoining the Auditor from further custody of City Savings Association, requiring defendant Auditor to restore to the association certain special assistant Attorney General fees and other costs which had been paid and refusing to allow additional attorney fees.

The action was instituted by plaintiffs as officers of the association pursuant to section 7—12 of the Illinois Savings and Loan Act of 1955 (Ill. Rev. Stat. 1957, chap. 32, par. 852) to enjoin further custody by the Auditor and for the entry of such further order as the court may deem in equity and good conscience. Intervenors petitioned the court on behalf of shareholders for an order re-opening the association and retaining jurisdiction to implement whatever decree the court should enter. Intervenors also petitioned the court for an order directing repayment of fees and costs to the association.

In 1908 City Savings Association was chartered by the State of Illinois to transact business as a savings and loan association. From its creation the association transacted its business pursuant to applicable law, free from any written criticism by the State Auditor, with no questions or objections raised regarding its operations or valuations until April 16, 1957. Elbert S. Smith was elected Auditor of Public Accounts of the State of Illinois in November, 1956, and took office as such on January 14, 1957. He caused an examination of the association to be instituted on February 18, 1957, which concluded on March 8, 1957.

The report of such examination was placed in the mail addressed to the officers and directors of the association on April 16, 1957, and was received by the association on April 18, 1957. Accompanying the report of examination was a letter of transmittal criticizing certain practices and challenging certain appraisals and valuations of the association. The letter specified 30 days as the "reasonable" time required by statute within which the criticized practices were to be corrected, and the report bore on its face a legend that it was strictly confidential.

Late in the afternoon of April 23, 1957, one of the plaintiffs, C. Oran Mensik, filed a lawsuit against the defendant Smith as Auditor and others, which suit made no reference to and did not involve City Savings Association. Prior thereto on the same day the Auditor of Public Accounts released the report of examination and the letter of criticism to the Chicago press. On the following day, April 24, 1957, the association was open and doing business as usual up to the close of business at noon. At 5:00 P.M. that day there appeared in one of the daily newspapers of Chicago a headline and article reading in part, as follows:

"FIND THREE NW SIDE SAVINGS FIRMS OF HODGE PAL SHORT 2 MILLION"

\* \* \*

"Smith said his examiners will be on hand Thursday morning. He said if a run develops, the State will step in and may invoke a by-law which requires 60 day notice for withdrawals over $500.00.

\* \* \*

"The confidential report noted that Mensik conducted his business in such a way 'that the Auditor may well be justified in a finding that the business of the Association is being conducted in a fraudulent, illegal and unsafe manner.' "

On the morning following the news story, that is, on April 25, 1957, a run occurred on the association and a crew of examiners and a photographer previously sent by the Auditor were on hand. The photographer had been instructed to take pictures every half hour. At 12:45 P.M. the Auditor took custody of the association. At that time

there was in excess of $270,000 cash on hand and, in addition, $1,000,000 was available by a previously committed loan from the Federal Home Loan Bank, of which the Auditor was aware.

On April 30, 1957, plaintiffs filed their action as officers of the association to enjoin further custody. The court referred the matter to a master in chancery, who proceeded with hearings from June 17, to August 9, 1957, and filed his findings of fact and conclusions of law on August 22, 1957. Thereafter oral arguments were had before the court on objections to the master's report.

On October 15, 1957, intervenors filed their petition for leave to intervene on behalf of stockholders, praying for reopening of the association and for retention of jurisdiction by the court, which intervention was allowed.

On December 6, 1957, the trial court entered a decree which adopted most of the master's findings and specifically found that the association was solvent at the time the Auditor took custody and had remained so throughout the proceedings; that association earnings had been substantially in excess of dividend requirements at all relevant times; that no emergency existed prior to the run on the association on April 25, 1957; that such run was the direct result of the publication of the news article on April 24, 1957; that such publication was the direct consequence of the Auditor of Public Accounts furnishing the confidential report of examination to the newspapers on April 23, 1957; that the Auditor expected that after publication by the press of such report an emergency would arise at the association and he prepared for such eventuality; and that the taking of custody by the Auditor prevented the officers and directors from complying with any of the requirements or correcting any of the practices objected to by the Auditor.

The decree of December 6, 1957, ordered that (1) the officers and directors of the association be permitted to

immediately resume control of the operation and management thereof subject to continued jurisdiction of the court; (2) the Auditor of Public Accounts and all his employees, *etc.*, be enjoined until further order of the court from custody and management of the association; (3) the Auditor account to the court for receipts and disbursements of the association during the period he was in custody thereof; (4) the Auditor return custody of the association to its officers and directors, subject to continued jurisdiction of the court; and (5) the officers and directors of the association, under the supervision of the court, undertake to perform certain specified undertakings with respect to conservation of assets, additional reserve requirements, management, officers' escrow accounts, leases of space in the association building and other matters.

Defendant Auditor filed a motion to vacate the decree which was denied. Prior thereto, the Auditor had applied to this court for leave to file a petition for writ of *mandamus* which was denied June 13, 1957. On December 26, 1957, the Auditor filed in this court a motion for leave to file a second petition for *mandamus* which was denied. On December 31, 1957, the Auditor filed notice of appeal to this court from the December 6, 1957, decree, which appeal was dismissed as not being a final appealable order under section 50(2) of the Civil Practice Act. In September, 1958, defendant Auditor filed a third petition for writ of *mandamus* for an order to require the expunging of the December 6, 1957, decree, which petition was dismissed as moot on March 10, 1959, after entry by the trial court of a final decree on February 3, 1959. Defendant Auditor never appealed the interlocutory injunction to the Appellate Court.

Custody of the association was restored to its officers and directors pursuant to the decree of December 6, 1957. From time to time plaintiffs made reports to the master in accordance with the decree. Such reports showed compli-

ance with all requirements except those relating to procuring insurance of share accounts which the court had recommended but had not made mandatory, and the disposition by plaintiff Mensik of his stock holdings in the First Guarantee and Chicago Guarantee Savings associations. Defendant Auditor was given the opportunity to file objections to such reports and the master from time to time imposed further requirements as a result thereof. In the period between restoration of custody on December 6, 1957, and the entry of final decree on February 3, 1959, the association received substantial new saving deposits, paid dividends to its shareholders for 1957 and 1958, distributed Christmas savings accounts to its shareholders, permitted depositor withdrawals of $5,000,000 and paid $1,000,000 on its loan from Federal Home Loan Bank.

On July 1, 1958, defendant Becker, as Director of Finance, succeeded to the powers and responsibilities of the Auditor of Public Accounts under the Savings and Loan Act, entered his appearance herein and was added as a defendant. Subsequent to restoration of custody, both Auditor Smith and Director Becker made further examinations of the association. Defendant Becker granted the association permission to sell $6,500,000 of mortgages at par to raise funds for further mortgage loans, and they were so sold.

Prior to entry of the final decree, intervenors had filed a petition for entry of an order directing the defendant Auditor to repay to the association certain fees and disbursements withdrawn from the association during his custody. After hearing, the court on December 24, 1958, directed the defendant Auditor to pay over to the association as improper disbursements of association funds during custody $45,748.40 legal expenses, $5,000 master's fees, $5,264.50 court reporter fees, and $7,665 accounting expenses. The sum of $28,838.75 in fees paid into the State treasury for examination and custody was not disturbed.

A petition by defendants for additional counsel fees in the amount of $73,000 was thereafter presented and denied.

On February 3, 1959, the court entered a final decree which, after adopting the findings of fact and conclusions of law made in the decree of December 6, 1957, ordered and adjudged: (1) that the defendants' motion to return custody of the association to the Auditor or Director of Financial Institutions be denied; (2) that defendants' motion for allowance of fees and expenses to the Auditor be denied; (3) that defendants' motion to vacate the order of December 24, 1958, directing the Auditor to repay to the association amounts improperly disbursed by him be denied; (4) that intervenors' motion to vacate an order directing the association to pay certain master's fees be denied; (5) that the master's reports on proceedings subsequent to the decree of December 6, 1957, and findings of substantial compliance therewith be approved and defendants' exceptions and objections thereto be denied; and (6) permanently enjoined the defendants and all of their employees, agents, *etc.,* from taking custody and management of the association on the basis of any examination or act which transpired prior to December 6, 1957, the date of the decree requiring the defendant to return custody of the association to its officers and directors.

Both the master and trial court, from substantial evidence, found that the Auditor's report of examination was inaccurate and misleading in that (a) the appraisal values adopted were not true appraisal values and could not be accepted in the face of appraisal reports by four experienced and independent appraisers; and (b) the schedule of loans subject to comment was inaccurate and misleading in that it presupposed and assumed certain facts which were incorrect and untrue. Based upon the appraisals and other evidence the court also found (a) an excessive valuation on the books of the association building of $72,210; (b) that the book value of the building was slightly in excess

of 2% of net assets, although section 5—9 of the Illinois Savings and Loan Act of 1955 permitted up to 5% of net assets for its office building without prior approval of the Auditor; (c) a doubtful value of $156,385.28 in total loans outstanding of $31,703,685.41, or 10% of the doubtful value assessed by the Auditor; (d) that the Auditor did not require kindred associations to establish any reserve for loss on United States Treasury bonds, and therefore no loss thereon as indicated by the Auditor should be allocated; and (e) the doubtful value of association assets on February 16, 1957, was $228,595.28, covering which there was a net reserve of $1,196,171.05.

In its decree of December 6, 1957, the trial court directed the officers and directors of the association, among other things, to undertake (a) to make all delinquent loans current in 90 days or institute foreclosure proceedings thereon; (b) to require further collateralization of loans by multiple borrowers; (c) to reduce book value of the office building; (d) to reduce the ratio of operating expenses to gross operating income to 25%; (e) that reserves be equal to not less than 5% of total liabilities; (f) that plaintiff Mensik relinquish all management and control of his two other savings and loan associations; (g) that the association attorney refrain from serving conflicting interests and pay fair rental for office space in the association building; (h) that an officer's escrow account be discontinued; (i) that unfavorable leases with a Mensik-owned safety deposit box company, insurance agency, and currency exchange be renegotiated; (j) that payment of employees' salaries in the insurance agency and currency exchange by the association be discontinued; (k) that an existing pension plan be suspended and referred to the master for modification and conformation to certain standards; and (l) that efforts be made to obtain insurance of withdrawable shares. The final decree found compliance with all except two of these requirements. As to Mensik's

required divestiture of management and control of his two other associations the court found Mensik had undertaken to divest himself thereof, and, as to the insurance of shares, the court found that there had been unsuccessful efforts to acquire such insurance but that the court's prior order in respect thereto had been directory and not mandatory.

The defendants in appealing to this court from the final decree urge as grounds for reversal that (a) the trial court assumed and usurped executive power contrary to article III of the Illinois constitution; (b) defendants were deprived of procedural due process contrary to the Illinois and United States constitutions; (c) the taking and retention of custody by the Auditor was justified and proper; (d) the trial court acted without jurisdiction in allowing prosecution of the case by unauthorized persons; (e) the trial court had no jurisdiction to order a reference to the master; (f) the trial court erred in allowing intervention; and (g) the trial court erred in ruling on fees and expenses.

The plaintiffs' position is, first, that defendants have failed to state a case cognizable on appeal because they are not parties aggrieved and because there is no justiciable controversy of constitutional construction, and, second, that the decrees of the trial court were constitutional, proper and appropriate in every respect.

The intervenors in their brief contend that this appeal is moot except as it relates to fees; that the trial court properly enjoined custody; that the question of jurisdiction under the interlocutory decree is not presented by this appeal but that such decree was within the court's power and authority and required by the facts.

The first issue which must be answered is the question of this court's jurisdiction on direct appeal. The defendants' basic and primary contention throughout this litigation has been that the trial court assumed and usurped executive power which was vested in the defendants con-

trary to article III of the Illinois constitution. Such contention was raised by them and argued at the first opportunity and consistently urged by them throughout the proceedings. They argue that it was the function and duty of the defendants, and not the court, to determine what corrective measures were necessary in the light of existing conditions and, further, to determine at a later time whether the corrective measures were carried out. The substance of such argument is that the trial court had no jurisdiction or power to decide such questions by virtue of the fundamental constitutional provision pertaining to the separation of executive, legislative and judicial powers contained in article III of our State constitution. The answer to this contention goes beyond a mere construction of the statute in question, although a construction of the statute in deciding the case may be necessary if this court has direct appellate jurisdiction. The question on this issue is whether or not the court exercised executive powers, and, if so, was such action a violation of the constitutional separation-of-powers clause. If such decree was unauthorized and without the court's jurisdiction, the Auditor has certainly been aggrieved and has a right to review, even though the course of litigation may have rendered moot many of the issues other than the portions of the decree concerning fees and costs. It is our opinion that this court has jurisdiction on direct appeal in this case because of the alleged usurpation of executive power by the judiciary. *Saxby* v. *Sonneman,* 318 Ill. 600; *People ex rel. Elliott* v. *Covelli,* 415 Ill. 79; *McQuade* v. *City of Joliet,* 293 Ill. 515; *West End Savings & Loan Ass'n* v. *Smith,* 16 Ill.2d 523.

The general statute involved in this case is the Illinois Savings and Loan Act of 1955. Ill. Rev. Stat. 1957, chap. 32, pars. 701-944.

In addition, the defendants' claim that they were denied procedural due process of law under both the Illinois and

Federal constitutions would require this court to take jurisdiction on direct appeal. *First Federal Savings and Loan Ass'n* v. *Loomis,* (7th cir.) 97 F.2d 831.

It would seem, furthermore, that the State may have a direct and substantial interest in the outcome of the suit, in that there is a claim that the attorneys for the defendants were improperly paid from association funds. If such contention is sustained, these fees may come from State funds. *People ex rel. Hamilton* v. *Cohen,* 355 Ill. 499; *State Board of Agriculture* v. *Brady,* 266 Ill. 592.

The initial and general responsibility for supervision under the Illinois Savings and Loan Act was vested before July 1, 1958, in the Auditor of Public Accounts and in the Director of Financial Institutions thereafter. Such supervisory authority delegated by the legislature is an executive function—the execution and administration of the law. One of the primary questions is whether the exercise of such executive power is exclusive and free of any checks, restraints or control by the judiciary, or whether it is subject to judicial limitations and control. An examination of the statutory provisions and intentions thereby expressed in the Savings and Loan Act is pertinent and necessary.

The first seven sections of article 7 of the act spell out the Auditor's general supervisory powers over savings and loan associations as to the making of regulations, examinations, audits, reports, information to Federal authorities, and procedure upon the impairment of guaranty and permanent reserve capital. Section 7—8 of the act pertains to the Auditor's authority to take custody. It first spells out five circumstances under which he may in his discretion take custody. The last paragraph of such section spells out that unless an emergency exists which may result in loss to members or creditors and requires that he take custody immediately, the Auditor shall first given written notice of the conditions criticized and state a reasonable time in which corrections may be made. Section 7—9

spells out the purposes of taking custody and 7—10 sets forth the Auditor's powers during custody. It should be noted that section 7—10 provides that the Auditor without appointment of a receiver but *upon order of a court of competent jurisdiction,* or with concurrence of two thirds of the directors, may make investments, agreements for payment of liabilities, borrow money, sell and assign assets, and doubtful debts, and give guaranties. Section 7—11 relates to custody of insured associations.

Section 7—12 pertains to notice of custody and action to enjoin. Upon the filing of a complaint within 30 days to enjoin further custody, and a rule to show cause thereon, the court is specifically authorized, if it finds that grounds for custody did not or do not then exist, to enter an appropriate order in accordance with the findings of fact, or an order enjoining the Auditor or any appointees acting under his direction from further custody.

Sections 7—13 and 7—14 concern the segregation of collections during custody and redelivery of possession. Section 7—15 limits custody by the Auditor to six months unless extension thereof is authorized by two thirds of the directors or by order entered in a court of competent jurisdiction.

Section 7—16 directs that the reasonable expense of any examination or investigation or custody shall be borne by the association. Sections 7—17 through 7—19 provide for the appointment, organization and powers of an advisory board. Section 7—20 authorizes any person who deems himself aggrieved by any action of the Auditor to file a petition with the circuit court setting forth the subject matter of the grievance, and the matter shall be tried *de novo* by the court. This latter clause has been held void as in violation of the separation-of-powers clause in *West End Savings & Loan Ass'n* v. *Smith,* 16 Ill.2d 523.

Subsequent articles in the act provide for reorganization, voluntary liquidation, and involuntary liquidation of sav-

ings and loan associations. In the event of involuntary dissolution a receiver appointed by the Auditor (now Director) liquidates the association under the orders and supervision of a court.

From all of the statutory provisions concerning supervision of savings and loan associations by the Auditor (now Director) it clearly appears that the legislature vested him with broad initial supervisory, regulatory and custodial powers, but not sole and unlimited powers. Section 7—8 of the act authorizes the Auditor to take custody only after notice and reasonable time for the association to make corrections, unless an emergency exists which may result in loss to members or creditors. Even then such custody may be challenged in the circuit court by an action to enjoin custody, and the court is specifically authorized to enjoin further custody or enter an appropriate order in accordance with the findings of fact. The statutory language here used, clearly and on its face, contemplates the possibility of the facts warranting an order other than one simply granting or denying the injunctive relief, otherwise there would be no reason for or meaning to be attributed to such alternative powers. The article of the act concerning supervision also provides for and contemplates a circuit court authorizing continued retention of custody beyond six months, authorizing certain acts of the Auditor while he is in custody, and reviewing *de novo* every questioned act of the Auditor during custody. This court has heretofore suggested that if the legislature did not accord the right to obtain judicial review and control of the Auditor's conduct the Savings and Loan Act would be constitutionally suspect. *Father Gordon Building and Loan Ass'n* v. *Barrett,* 370 Ill. 536; *People ex rel. Barrett* v. *Logan County Building and Loan Ass'n,* 369 Ill. 518.

From a consideration of the record, we conclude that the court did not usurp the Auditor's right to initially exercise executive authority in the execution and administration

of the Savings and Loan Act, but exercised its clearly vested authority to check, restrict and prevent what it considered from the facts to be an arbitrary exercise of such executive authority, granted by statute and as part of its general equity powers. *Moore* v. *Gar Creek Drainage District,* 266 Ill. 399, and cases cited.

The recent decision of this court in *West End Savings & Loan Ass'n* v. *Smith,* 16 Ill.2d 523, is not contrary to this conclusion. There the Auditor made a determination, after petition and hearing of evidence, that permission to change location of an association should be granted. We held that section 7—20 of the act providing for a trial *de novo* in court of any action of the Auditor complained of was unconstitutional as violating the separation-of-powers clause. At the same time, it was said, at page 525, "where the agency's determinations are made conclusive, constitutional objections are held to be without merit, providing that recourse to the courts is available in cases of oppression or abuse of discretion."

Such holding in the *West End case* does not apply to the situation in the instant case. Plaintiffs have not appealed from an administrative board decision entered after notice and hearing. No such procedure prior to taking custody is provided by the act and no regulations provide therefor. Defendants' action was taken *ex parte* without an opportunity to be heard and to present evidence. The court in this case is not hearing evidence in addition to that heard by an executive body, or reweighing the evidence, or substituting its judgment for that of an executive. Rather in the instant case the court is hearing, in a proceeding and on pleadings provided for by the act, whether the defendants' order taking custody was lawful and reasonable, or an abuse of discretion, and the questions presented concern substantial property rights of which the court is given jurisdiction by the statute. After determining the facts as to illegality or unreasonableness, the court

had specific statutory power to enter further appropriate orders.

From a consideration of this record we are further of the opinion that the trial court properly found from the evidence that the Auditor abused his discretion in taking custody and enjoined his further custody. The Auditor submitted to the association his letter of criticism and gave 30 days in which to make corrections. The conditions criticized as a practical matter of reality could hardly be corrected in 30 days. The report and letter of criticism were received on April 16, 1957. On April 24, 1957, the Auditor released the documents for publication, in spite of the fact that it bore a legend in bold face type that it was "Strictly Confidential." Section 7—6 of the act limits the giving of the report of examination to the Federal Home Loan Bank or to the insurance corporation insuring the association's shares.

The Auditor, in releasing the report to the press, prompted the news article, which in turn triggered the run, creating the so-called emergency. The proof developed that the association was solvent at the time the Auditor took custody and has remained so. The findings of fact do not permit doubt that the court's decree enjoining further custody was an appropriate order.

However, the court also found certain matters to exist that required correction. Therefore the court imposed upon the officers and directors the obligation to correct the deficiencies and retained jurisdiction to insure compliance. The language found in the act which authorizes the court to enter "an appropriate order in accordance with the findings of fact" indicates that the legislature intended the court to exercise its historic powers of equity to shape its decree so as to do substantial justice to the parties.

Section 7—12 of the act empowered the court to enjoin a wrongful custody of the Auditor, and only a court of equity can enjoin. (*Fletcher* v. *Tuttle,* 151 Ill. 41.) It is

manifest from the very terms of the act that the court was acting as a court of equity. Having jurisdiction as a court of equity, and having heard the Auditor's attempted justification of his conduct, the court patently had jurisdiction to enter a decree adjudicating all the matters in controversy to avoid multiplicity and to do full and complete justice. *First National Bank* v. *Bryn Mawr Beach Bldg. Corp.* 365 Ill. 409; *Weininger* v. *Metropolitan Fire Ins. Co.* 359 Ill. 584.

Defendants further argue that the master's and court's findings of compliance by plaintiffs with the court's decree of December 6, 1957, without granting defendant a hearing on objections to the master's reports of compliance, denied defendants procedural due process in violation of the State and Federal constitutions. Although the Auditor had previously been ousted from custody, he advances this argument as a claimed trustee of the properties and interests of the individual shareholders. He asserts no rights deriving from his own individual capacity. In our opinion the defendants as State officers have no property interest in these matters complained of sufficient to permit them to assert this claim. Governmental bodies or State agencies are entitled to constitutional guaranties of due process only when their property rights are involved. *People ex rel. Royal* v. *Cain,* 410 Ill. 39; *People* v. *Deatherage,* 401 Ill. 25; *People ex rel. Curren* v. *Wood,* 391 Ill. 237; *Dunne* v. *County of Rock Island,* 283 Ill. 628.

Defendants further urge that the trial court was without jurisdiction because the suit was not instituted by proper parties. The suit was instituted by the president, secretary and vice-president of the association, being a majority of its statutory officers and two of whom were directors. Section 7—12 of the act requires the Auditor to mail notice of custody "to the president or secretary and not less than two directors." The section then provides that if the contention is made that custody is illegal "the directors or

officers of the Association" may file an action. The section must be construed in its entirety. It seems to be the intent that the officers and directors authorized to bring the suit may be the same persons as those upon whom notice of custody is served. There is nothing in the statute that requires all of the officers or all of the directors, or a majority of either group, to maintain the action. There is no statutory support for defendants' contention in this respect.

Defendants further contend that the referral to a master in chancery was beyond the court's jurisdiction because this was a special statutory proceeding and not a chancery action. From what has heretofore been said, section 7—12 of the act does not designate the mode of trial but does designate the remedy as injunctive and other appropriate action, and thereby gives the court equity jurisdiction squarely within the purview of the Civil Practice Act. Under section 61 of the Civil Practice Act reference to the master was proper. Ill. Rev. Stat. 1957, chap. 110, par. 61.

Error is further argued by the defendants because of the intervention by stockholders allowed by the trial court. The intervention statute (section 26.1 of the Civil Practice Act) provides that anyone shall be permitted as of right to intervene whenever the representation of his interests by existing parties may be inadequate and he may be bound by any judgment, decree or order entered in the action. It also permits intervention in the discretion of the trial court. This section was designed to liberalize intervention practice, and particularly to relax the requirement that the intervenor have a direct interest in the suit. (*Dowsett* v. *City of East Moline*, 8 Ill.2d 560.) The shareholders' intervening petition alleged that they represented 7,000 shareholders, that the shareholders would or might be bound by the judgment which would affect them and that there was no one in the case directly representing their interests. The intervening petition requested the court to retain jurisdic-

tion to assure correction of doubtful management practices. It was opposed by both plaintiffs and defendants. Defendants do not show in what manner intervention unduly complicated or delayed the case nor do they show any prejudice by reason of the fact that intervention came after the reference to the master. We are of the opinion that the trial court did not abuse its discretion in permitting intervention.

Finally the defendant argues that the trial court erred in its order of December 24, 1958, directing the defendant Auditor to repay to the association the total amount of $63,677.90 representing attorneys' fees, master's fees, court reporters' fees and accountants' fees paid during the period of custody.

No question as to the reasonableness of any of these fees is before this court.

The Illinois Savings and Loan Act evidences an intention by the legislature to provide a comprehensive plan for the supervision of savings and loan associations generally and for the liquidation of particular associations under certain circumstances. Section 7—16(a) of that act, (Ill. Rev. Stat. 1957, chap. 32, par. 856,) provides that the reasonable expense of any examination or investigation or custody shall be borne by the association. Again, section 10—4 of that act, (Ill. Rev. Stat. 1957, chap. 32, par. 924,) provides that all expenses incurred by reason of the examination, custody and receivership shall be paid by the association. No attack is made upon the constitutionality of either of these statutes and in view of our decision in *People v. Illinois Toll Highway Commission,* 3 Ill.2d 218, the statutory provisions for the payment of fees from association funds is not, in and of itself, unconstitutional.

The question here presented was, under similar circumstances and under a statute containing similar provisions, before the Supreme Court of California in *Evans v. Superior Court,* 14 Cal.2d 563, 96 P.2d 107, and there the Supreme Court of California held that fees and expenses

incurred during a period while an injunction suit was pending against the commissioner, seeking to enjoin the taking of possession of the association, were, by virtue of the provisions of statutes similar to ours, properly payable out of the association funds, the court stating, at page 112, (P.2d): "Respondents apparently concede that Section 13.16 of the act expressly empowers the Commissioner to employ assistants such as special counsel, accountants and appraisers, and to compensate such assistants out of the funds of an association in his hands under certain circumstances but it is respondents' claim that the commissioner will have no such power here until the main injunction suit may have terminated in his favor and until he may have determined to proceed with the liquidation of said association. We do not believe that this claim may be sustained."

We feel that the fees and expenses which the court below ordered the defendant to refund to the association were expenses properly within the purview and contemplation of section 7—16(a) and section 10—4 of the Illinois Savings and Loan Act and were expenses chargeable to the association.

The court was in error in his order directing the defendant to repay to the association such fees and expenses, and that portion of the court's order in which the defendant auditor is ordered to repay to the association certain fees and expenses therein enumerated is reversed.

In all other respects the decree is affirmed.

*Affirmed in part and reversed in part,*

Mr. Justice SCHAEFER, dissenting:

I think that the opinion of the court is wrong as to each of the three principal issues it decides.

1. I think that the plaintiffs are correct in their contention that this court does not have jurisdiction upon direct appeal. The opinion sustains our jurisdiction "because of

the alleged usurpation of executive power by the judiciary."
It is true that the appellants have argued that the super-
vision of banks and building and loan associations is a
function of the executive branch of the government and
not of the judicial branch and that therefore article III of
the constitution has been violated. For that proposition
they have relied upon *People ex rel. Benefit Ass'n of Rail-
way Employees* v. *Miner,* 387 Ill. 393, 397; *People ex rel.
Palmer* v. *Niehaus,* 356 Ill. 104, 109, and *People ex rel.
Barrett* v. *Logan County Building and Loan Ass'n,* 369 Ill.
518, 525-6. Those cases do speak of the function of the
Auditor (or of the Director of the Insurance Department)
as "executive" in nature. They are "executive," however,
only because the legislature has made them so. There is
nothing inherently "executive" about a receivership pro-
ceeding in equity, whether it terminates in liquidation or not.

The way to test what is involved is to ask whether a
statute would be unconstitutional which in specific terms
authorized a judge to enter, upon a proper showing, the
exact orders that were entered here. To me the power of
the legislature to enact such a statute is so clear that its
validity would not present a debatable constitutional ques-
tion. The principle of separation of powers would not be
violated if the legislature provided that the affairs of build-
ing and loan associations should be handled in the same way
that the affairs of corporations were traditionally handled
in Federal equity receiverships. No constitutional question
more debatable than that is presented in this case, and in
the absence of a debatable question this court does not have
jurisdiction on direct appeal.

The opinion also states: "In addition, the defendants'
claim that they were denied procedural due process of law
under both the Illinois and Federal constitutions would re-
quire this court to take jurisdiction on direct appeal. *First
Federal Savings and Loan Ass'n* v. *Loomis,* (7th cir.) 97
F.2d 831." The opinion does not indicate what possible

bearing a decision of a Federal court of appeals can have upon the question of the jurisdiction of this court upon direct appeal. On this point the contention of the appellants is that they were denied the right to cross-examine witnesses, and to rebut their opponents' evidence. If such errors were committed, they are not of constitutional dimension. Due process does not guarantee that the rules governing the manner in which a controversy is tried will be applied without error in every case. For that reason we have consistently held that procedural errors that may occur in the course of a trial do not present constitutional questions and are reviewable only on appeal to the appellate courts. *E.g., Biggs* v. *Plebanek,* 407 Ill. 562; *People* v. *Jiras,* 340 Ill. 208, 211-12.

The third ground upon which the opinion rests our jurisdiction is that there is a contention that the attorneys for the Auditor were improperly paid from funds of the association and that "If such contention is sustained, these fees may come from State funds. *People ex rel. Hamilton* v. *Cohen,* 355 Ill. 499; *State Board of Agriculture* v. *Brady,* 266 Ill. 592." Each of the cited cases was a *mandamus* action to compel officers of the State to prepare and issue warrants drawn upon the State treasury. No claim against the State is asserted in the present case. I do not see how a possibility that the State might have an interest in some hypothetical case that might be instituted in the future can support jurisdiction in the case at bar.

2. In my opinion the trial court exceeded its jurisdiction. This action was brought under section 7—12 of the Illinois Savings and Loan Act. That section provides a special remedy by which it can be speedily determined whether or not the Auditor had legal grounds for taking custody of a building and loan association. It first requires the Auditor, immediately upon taking custody, to "mail a written notice thereof" to designated officers and directors of the association. It continues: "If the contention is made

that the Auditor has no legal grounds for taking custody of the association or trust, the directors or officers of the association or the trustees or liquidators thereof, as the case may be, at any time within thirty (30) days after the mailing of such notice, may file a complaint in the Circuit Court of Sangamon County, Illinois, or in the circuit or superior court of the county in which the association is located, to enjoin further custody. The court thereupon shall cite the Auditor to show cause why further custody should not be enjoined. If upon a hearing thereon, the court shall find that such grounds did not or do not then exist, it may enter an appropriate order in accordance with the findings of fact, or an order enjoining the Auditor or any appointees acting under his direction from further custody." Ill. Rev. Stat. 1955, chap. 32, par. 852.

To understand the problem that exists as to the jurisdiction of the trial court under this statutory authority, it is necessary to set forth *verbatim* some of the provisions of the decree of December 6, 1957. That decree is now before us for review. (Ill. Rev. Stat. 1959, chap. 110, par. 74(1); *cf. Biagi* v. *O'Connor*, 18 Ill.2d 238, 241.) It ordered that the officers and directors be permitted immediately to resume control of the association, enjoined the Auditor from custody until the further order of the court, and ordered the Auditor to make an accounting within 10 days and to return custody of the association to the officers and directors within 7 days. The decree continued:

"5. That the officers and directors of City Savings Association immediately undertake to do the following:

A. With Respect to Conservation of Assets

(1) All delinquent loans shall be required to be made current by the borrower within ninety (90) days from the date hereof, or foreclosure proceedings immediately instituted. In instances where the borrower is able to further collateralize the loan in consideration for forbearance from foreclosure, the collateral shall be described in a report to this Court, and if approved, may be accepted in lieu of immediate payment for the entire delinquency. In each instance, however, a substantial

portion of the delinquency must be secured by payment in cash, in addition to the further collateral.

(2) All multiple borrowers shall be required to further collateralize all present loans to the extent of six per centum (6%) of their present unpaid balances before being granted any further loans.

(3) The value of the City Savings Association office building shall be carried on the books of the Association at a value of Six Hundred Thousand Dollars ($600,000.00), as of April 30, 1957.

(4) The ratio of operating expenses to gross operating income should be revised downward to not in excess of twenty-five per centum (25%).

B. Regarding Additional Reserve Requirements

(1) This Court hereby reserves jurisdiction to impose, in addition to the conditions imposed hereby, a requirement that reserves be in an amount equal to not less than five per centum (5%) of the total liabilities of the City Savings Association, including liabilities to withdrawable shareholders as of February 1, 1958, by which date it may fairly be assumed that the amount of withdrawable share accounts remaining in the Association and those requesting withdrawal will be definitely determined.

C. Concerning Management

(1) C. Oran Mensik having been elected to serve as president and director of City Savings Association, subject to the by-laws of the Association covering the election of officers and directors, he shall divest himself from all management and control of First Guarantee Association and Chicago Guarantee Association, and shall cease forthwith to serve as an officer or director of either First Guarantee Association or Chicago Guarantee Association, and so long as he shall remain the president and chief managing officer of City Savings Association, shall not associate himself in a management capacity with any other savings and loan association.

(2) That Attorney A. J. Pikiel is hereby permanently enjoined from serving City Savings Association and any of its borrowers in the same transaction, and from serving City Savings Association and at the same time serving any other person in any transaction with said City Savings Association.

(3) That Attorney A. J. Pikiel, if he occupies space in the offices of City Savings Association, shall pay the Association a fair rental therefor.

D. Regarding the Officers' Escrow Account

(1) The officers and directors of City Savings Association,

and their agents, representatives, subordinates and employees, and their respective successors, are hereby permanently enjoined from continuing or creating an officers' escrow account.

(2) Said officers and directors of City Savings Association, and their agents, representatives, subordinates and employees, and their respective successors, shall not create any escrow account other than that pursuant to which the particular transaction between City Savings Association and a borrower from the Association demands the creation of an escrow account to complete such transaction.

E. Regarding Leases of Space in City Savings Association Building

(1) The officers and directors of City Savings Association shall renegotiate the lease with City Safe Deposit Company, and adjust the same to provide for adequate rentals commensurate with the amount of space occupied for offices of said safe deposit company and for safe deposit box space.

(2) The officers and directors of City Savings Association shall renegotiate the lease with City Insurance Agency, and adjust the same to provide for adequate rentals commensurate with the amount of space occupied for offices of said insurance company.

(3) The officers and directors of City Savings Association shall renegotiate the lease with City Currency Exchange, and adjust the same to provide for adequate rentals commensurate with the amount of space occupied for offices of said currency exchange.

F. Other Acts and Policies

(1) The officers and directors of City Savings Association and their agents, representatives, subordinates and employees, and their respective successors, shall not pay in whole or in part any of the salaries of any of the employees of either City Insurance Agency or City Currency Exchange.

(2) The bond account consisting wholly of United States Government bonds does not need a reserve for contingent loss, such requirement being contrary to the policies of the present Auditor of Public Accounts, and being inimical to the national interest in the promotion of the sale of United States Government bonds as the most secure investment available to any investor.

G. Re-reference to Master in Chancery

(1) There is hereby re-referred to Nathan M. Cohen, Master in Chancery herein, to take proof and to report his findings of fact, conclusions of law and recommendations to this Court within thirty (30) days from the date hereof, with respect to the

fair and reasonable rental to be paid to City Savings Association by the following:

(a) City Insurance Agency;
(b) City Safe Deposit Company;
(c) City Currency Exchange;
(d) Mr. and Mrs. A. J. Pikiel, Attorneys.

(2) The officers and directors of City Savings Association are hereby permanently enjoined from carrying out the present terms of the pension or deferred compensation plan now in effect, and the plan shall be modified to provide for contributions by the employees affected, and said plan shall conform in all substantial requirements with the pension plan recommended by the United States Savings and Loan League. The matter of said conformance and compliance is hereby re-referred to Nathan M. Cohen, Master in Chancery herein, for the taking of proofs and reporting his conclusions and recommendations to this Court within thirty (30) days from the date hereof.

H. Periodic Reports to the Court

The matter of the officers and directors of City Savings Association, and their agents, employees and subordinates, and their respective successors, complying with the terms of this Order, shall be made the subject of periodic reports to this Court. Such reports are to be submitted first to Nathan M. Cohen, Master in Chancery; thereafter to be submitted to this Court, accompanied by the Master's covering report, within ten (10) days after the filing with him of each such report, except if he shall deem it necessary to take proofs with respect to the subject matter of such report. If, in the discretion of the said Master in Chancery, the taking of proofs is required, he shall apply to this Court for an appropriate order. The first of such reports is to be filed with the Master within thirty (30) days from the date hereof. The costs of said hearings, including Master's fees, shall be paid by City Savings Association, subject to the approval of the amounts of said costs by this Court.

I. Insurance

The officers and directors of City Savings Association, and their agents, employeese and subordinates, and their respective successors, shall exert every effort to contract for the insurance of withdrawable share accounts by the Federal Savings and Loan Insurance Corporation, or by a qualified private insurance company. A progress report concerning such efforts is to be submitted to the Master in accordance with the terms of paragraph H hereof."

Acting under this decree, with a master in chancery performing functions akin to those of a receiver, the court

managed the most intimate details of the operations of the association for a period of 14 months. I find it impossible to reconcile the authority thus exercised by the trial court with the authority granted by the statute to determine whether or not legal grounds existed for taking custody of the association. To bridge the gap the opinion of the court attempts to read into the statute a grant of general equity powers. It states: "The language found in the act which authorizes the court to enter 'an appropriate order in accordance with the findings of fact' indicates that the legislature intended the court to exercise its historic powers of equity to shape its decree so as to do substantial justice to the parties." This assertion can not survive even a casual reading of the statute. The only issue to be presented to the court is whether the statutory grounds which authorize the Auditor to take custody existed when he took custody, or exist when the hearing is held. That is the only issue upon which the court is authorized to make findings. The statute says, "If upon a hearing thereon, the court shall find that such grounds did not or do not then exist, it may enter an appropriate order in accordance with the findings of fact, or an order enjoining the Auditor or any appointees acting under his direction from further custody." If by this language the legislature intended to confer upon the court the historic powers of equity, it chose a remarkable way of doing so. Of course the legislature had no such intention.

The opinion also states that "the court had specific statutory power to enter further appropriate orders." But the opinion does not explain the process by which the language of the statute referring to "an appropriate order" is converted into "specific statutory power to enter further appropriate orders." No conceivable expansion of the phrase "an appropriate order," in its context of a summary citation to show cause and a finding as to the existence or nonexistence of statutory grounds authorizing the Auditor

to take custody, can justify the jurisdiction here exercised by the trial court.

3. On the merits, it is my opinion that action of the Auditor was justified. Section 7—8 of the act enumerates the grounds upon which the Auditor is authorized to take custody of an association. To sustain his action in this case it is necessary to refer to only one of them: "(d) That the business of the association * * * is being conducted in a fraudulent, illegal, or unsafe manner; * * *." (Ill. Rev. Stat. 1955, chap. 32, par. 848) The portions of the decree set forth above fully establish this ground of custody.

The decree is self-explanatory as to some of the conditions that it condemned. As to others, a word of explanation and identification is necessary. C. Oran Mensik was president of the association here involved, City Savings Association. He was also president of the two other building and loan associations mentioned in the decree, First Guarantee Association and Chicago Guarantee Association, and he owned more than 90% of the stock of those two associations. The "multiple borrowers" referred to in the decree were four construction companies, each of which was owned or controlled by relatives or close business associates of Mensik. Total City Savings Association loans outstanding in February of 1957 were approximately $8,400,000. Of this amount approximately $6,300,000 represented loans to those four building corporations. Mensik also owned City Safe Deposit Company, City Insurance Agency and City Currency Exchange, all of which leased space from the association. The "deferred compensation plan" to which the decree refers consisted of noncontributory contracts with Mensik and three other officers of the association which provided for voluntary retirements at age 45.

It would be unnecessary to say more if it were not for certain inadequacies and inaccuracies in the opinion of the court. The opinion states that from the time of its creation in 1908 "the association transacted its business pursuant to

applicable law, free from any written criticism by the State Auditor, with no questions or objections raised regarding its operations or valuations until April 16, 1957."

The fact is that the affairs of City Savings Association and Mensik's two guarantee associations came under scrutiny immediately after Orville Hodge ceased to be Auditor of Public Accounts in the summer of 1956, and "questions and objections concerning its operations and valuations" existed continuously thereafter. Mensik's two guarantee associations were organized in June of 1955. Shortly before their charters were approved Mensik delivered a City Savings Association check for $50,000 to Hodge. The check was drawn on the "officers escrow" account referred to in the decree. Mensik described this transaction as a personal loan on an unsecured note. He testified that the loan was repaid a year later by Hodge's check, but he did not know where the check had been cashed. While Hodge was Auditor, City Savings Association had also made a $200,000 mortgage loan on a hotel owned by Hodge at Fort Lauderdale, Florida. Two days after Dr. Lloyd Morey succeeded Hodge as Auditor of Public Accounts, Mensik purchased this mortgage with a check of the Melvin Building Corporation, one of the "multiple borrowers." Mensik testified that at the time of his purchase the building corporation owed him $200,000 on an unsecured note. The mortgage was subsequently sold back to the association by Mensik. There were other bizarre transactions with the former Auditor for which satisfactory explanations were not forthcoming.

Dr. Morey commenced an investigation immediately upon his appointment. The written preliminary report of that investigation is in the record, and it is critical of the conditions that were found. These conditions were the subject of discussions between Dr. Morey and Mensik, and Dr. Morey specifically brought them to the attention of his successor, Auditor Smith.

The opinion does not adequately state the facts concerning the release of the Auditor's report to the press. The Auditor had taken custody of Mensik's two guarantee associations on February 18, 1957. Thereafter, the newspapers pressed the Auditor's office daily for information, and press conferences were held in which Mensik's then attorney participated. No report of the fact that the Auditor had taken custody was published, however. Efforts to reorganize the two associations were proceeding, and the Auditor was cooperating with Mensik and his attorney in the reorganization efforts. An understanding with the press contemplated that nothing would be published while negotiations for reorganization were pending. Reports of the conditions of the two associations, with portions deleted, were refused by the press. After many weeks had passed with the press continuing to demand complete reports, April 23 was fixed as the date when the reports of all three associations would be made available to the press. Mensik's then attorney testified that at a conference with representatives of the Auditor's office on the morning of April 23, the proposed release that afternoon was discussed, and "* * * in substance I said that it seemed to me that it was the only way to prevent publicity."

About 3:00 P.M. on April 23 the Auditor's reports with respect to the three associations were released to the press in accordance with the existing understanding. Nothing appeared in any newspaper on April 23 or on the morning of April 24. At 4:41 P.M. on April 23 Mensik filed an action for $2,000,000 against the Auditor and others, alleging that they had illegally taken custody of the two guarantee associations. At 2:05 P.M. on April 24 Mensik sent the following telegram to the city editors of the newspaper: "Will have a press conference 9:30 A.M. Thursday at my office at First Guarantee Savings, 5920 West North Avenue pertaining to two million dollar conspiracy suit involving my majority stock at First Guarantee Savings

Association and Chicago Guarantee Savings Association filed Tuesday, Circuit Court case No. 57 C 5732. C. Oran Mensik, Board Chairman First Guarantee Savings Association." The first assistant city editor of one of the major newspapers testified: "And upon reading the telegram with the information that Mr. Mensik had filed a suit, my reaction was then this agreement no longer existed, because the filing of the suit made the whole—put the whole situation into public record and made it available for inspection by anybody." Thereafter, at 5:00 P.M., on April 24, the article referred to in the opinion was published.

On this record I do not see how it can be said, as the opinion says, that "The Auditor, in releasing the report to the press, prompted the news article, which in turn triggered the run, creating the so-called emergency."

The opinion also states: "Section 7—6 of the act limits the giving of the report of examination to the Federal Home Loan Bank or to the insurance corporation insuring the association's shares." I find no such limitation in section 7—6, which reads as follows: "The Auditor may give copies of reports of his examinations of an association, and copies of the association's reports to him, and any other information he has concerning the association, to the Federal Home Loan Bank (or its successor instrumentality) of which the association is a member, or to the insurance corporation which has insured the association's capital; but no such action by the Auditor shall relieve the association from compliance with any requirements of such Federal institution concerning examinations or reports, or limit the Auditor's powers to examine or to require reports from the association." (Ill. Rev. Stat. 1955, chap. 32, par. 846.) Nowhere does the act prohibit the publication of reports by the Auditor. On the contrary, section 7—2(c) of the act provides: "In the interests of the members of the association, the Auditor may prepare a statement of the condition of the association, and may mail the same to the members

604

or may require a single publication thereof." (Ill. Rev. Stat. 1955, chap. 32, par. 842.) In my opinion the Auditor neither violated the law nor abused his discretion in releasing the report of the association to the press.

Mr. JUSTICE DAVIS joins in this dissenting opinion.