Alexander TCHEREPNIN et al.,
Plaintiffs-Appellees,

v.

Robert FRANZ et al., Defendants,
J. J. Lowenthal et al., Class of Intervening
Defendants, Appellants.

No. 18581.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1971.

Decided May 15, 1972.

Rehearing Denied June 20, 1972.

Maurice J. Walsh, Carl M. Walsh, Chicago, Ill., for appellants.

A. Bradley Eben, Solomon Jesmer, Arnold I. Shure, Chicago, Ill., for appellees.

Before MAJOR* and HASTINGS, Senior Circuit Judges, and PELL, Circuit Judge.

PELL, Circuit Judge.

This court once again is confronted with a problem stemming from the collapse of City Savings Association (CSA), a savings and loan institution chartered by the State of Illinois and presently under the control of federal receivers. The main contention of the appellants here, a group of depositors-shareholders, is that the district court erred in concluding that another group of depositors-shareholders (the plaintiffs in the action) has a preference in the distribution of CSA's assets. The appellants assert they, too, were defrauded in violation of the anti-fraud provisions of the Securities Exchange Act of 1934 and that, therefore, but one group or class of depositors-shareholders exists, all members of which are entitled to rescission under the Act with a resultant equal footing at the time of the distribution of remaining CSA assets.

## I

Because other decisions concerning CSA have chronicled much of its complicated and unfortunate history,[1] we will discuss the factual background only to the extent necessary to explain the present appeal. Further reference here-

---

\* Senior Circuit Judge Major, whose death occurred on January 4, 1972, heard oral argument, but did not participate in the adoption of this opinion.

1. The reported decisions include Mensik v. Smith, 18 Ill.2d 572, 166 N.E.2d 265 (1960); Tcherepnin v. Franz, 277 F. Supp. 472 (N.D.Ill.1966); Tcherepnin v. Knight, 371 F.2d 374 (7th Cir.), rev'd, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); Tcherepnin v. Kirby, 416 F. 2d 594 (7th Cir. 1969); and Tcherepnin v. Franz, 316 F.Supp. 714 (N.D.Ill. 1970).

in to the plaintiffs below will usually be as the "post-July 9, 1959 depositors" and to the intervening defendants, the appellants on this appeal, as the "pre-July 9, 1959 depositors."

In April 1957, the Auditor of Public Accounts of the State of Illinois took custody of CSA and suspended payments to depositors. Pursuant to a decree entered by the Circuit Court of Cook County, Illinois, in December 1957, the State Director of Financial Institutions restored custody of CSA to its officers and directors. The association reopened to the public on December 19, 1957, but on a limited withdrawal rotation basis as to its then existing accounts.

In February 1959, the Circuit Court entered a final decree adopting the findings and conclusions of its December 1957 decree. In Mensik v. Smith, 18 Ill.2d 572, 166 N.E.2d 265 (1960), the Supreme Court of Illinois affirmed the decree returning the operation of CSA to its management. However, in June 1964, the Director of Financial Institutions of the State of Illinois seized CSA from its officers once again. He immediately closed CSA. Acting through the Director, the State retained custody of CSA until early September 1964, when three liquidators took custody under a plan of voluntary liquidation.

Unhappy with the course of the voluntary liquidation, the post-July 9, 1959 depositors moved for the appointment of a federal receiver. In September 1968, the district court below granted their motion and appointed two federal receivers. They have managed the assets of CSA since September 19, 1968.

While CSA was in the custody of the State of Illinois, post-July 9, 1959 depositors instituted a class suit which allegedly represented over 5000 investors. In their complaint, they claimed that they had purchased withdrawable capital shares in CSA after July 23, 1959,[2] and

that the sales of these shares to them were void under § 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc (b). They asked that the sales be rescinded. The complaint alleged that the withdrawable capital shares they had purchased from CSA were securities within the meaning of § 3(a) (10) of the Act, 15 U.S.C. § 78c(a) (10), that in buying the shares they had relied upon printed solicitations that CSA had mailed to them, and that these solicitations contained false and misleading statements in violation of § 10(b) of the Act, 15 U.S.C. § 78j(b), and of Rule 10b–5 adopted thereunder, 17 C.F.R. § 240.10b–5. More specifically, the complaint alleged that the mailed solicitations erroneously portrayed CSA as a financially strong institution and its shares as desirable investments.

The class that the appellants here represent consists largely of those persons originally represented by the 100 Cents on the Dollar Shareholders Committee which was permitted in January 1966 to intervene in the Securities Exchange Act suit as a party-defendant. As such, it answered plaintiffs' complaint by denying or by claiming lack of information about the commission of the frauds alleged in the complaint. It contended that the plaintiffs' suit was a spurious class action and should be dismissed. Also, together with the named defendants (not parties to this appeal), it sought dismissal of the plaintiffs' action on the jurisdictional grounds ultimately rejected by the United States Supreme Court in Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Until the Supreme Court in *Tcherepnin* decided otherwise, the intervening defendants maintained that Illinois law controlled the resolution of CSA's problems.

In Tcherepnin v. Knight, *supra*, the United States Supreme Court held that the federal district court had jurisdic-

---

2. Notwithstanding the date stated in the complaint, the district court specified July 9, 1959 as the operative date for plaintiffs' class. On that date, an amend-

ment to the Illinois Savings and Loan Act permitting new or additional capital accounts, which were to be withdrawable at will, became effective.

tion of the action instituted by the post-July 9, 1959 depositors because a withdrawable capital share in a state-chartered savings and loan association was a "security" within the meaning of the Securities Exchange Act of 1934. At the end of its opinion, the Court remarked:

> "The respondents have argued that we should not declare the petitioners' withdrawable capital shares securities under § 3(a) (10) because the petitioners, if they are successful in their suit for rescission, will gain an unfair advantage over other investors in City Savings in the distribution of the limited assets of that Association, which is now in liquidation. This argument, at best, is a *non sequitur.* This case in its present posture involves no issue of priority of claims against City Savings. This case involves only the threshold question of whether a federal court has jurisdiction over the complaint filed by the petitioners—a question which turns on our construction of the term 'security' as defined by § 3(a) (10) of the Securities Exchange Act of 1934. It is totally irrelevant to that narrow question of statutory construction that these petitioners, if they are successful in their federal suit, might have rights in the limited assets of City Savings superior to those of other investors in that Association." 389 U.S. at 346, 88 S.Ct. at 558.

## II

In an order dated March 10, 1970, the district court concluded that the plaintiffs and their class were purchasers of securities within the meaning of the Securities Exchange Act. The establishment of their accounts, which were withdrawable at will, had resulted from a new section of the Illinois Savings and Loan Act that became effective on July 9, 1959. The new section provided in substance that an association could accept new and additional withdrawable capital accounts and that such new or additional accounts would not be subject to the sec-

tion of the Illinois Act restricting withdrawals.

The court found that, before making their purchases, the plaintiffs had not been advised that CSA was operating under a limited withdrawal restriction as to all the pre-July 9, 1959 accounts. Further, in CSA's extensive advertising campaign subsequent to the effective date of the statutory amendment and continuing through July 26, 1964, soliciting new deposits, CSA made numerous fraudulent misrepresentations, misstatements and omissions.

The court specifically found that CSA's insolvency resulted primarily from "[e]xtensive fraudulent mortgage loans" that CSA made after July 9, 1959, particularly in the Apple Orchard and the Howie in the Hills developments. The court also stated that, without the knowledge of the plaintiffs and their class, CSA had illegally used "considerable funds" deposited by them on or after July 9, 1959, to make payments to pre-July 9, 1959 depositors.

In light of all the above, the court concluded "as a matter of law" that the plaintiffs and their class had been defrauded within the meaning of the anti-fraud provisions of the Securities Exchange Act. As defrauded purchasers of securities, they had a right to rescind their purchase agreements and, upon the rescission, were entitled to assert a claim against CSA as judgment creditors having priority over "other shareholders or depositors . . . [and] any other creditors."

The court found that only the plaintiffs and their class had properly pleaded a claim under the Securities Exchange Act. The pre-July 9, 1959 depositors "had repeated public notice of the prior fraud and had actual knowledge of the limited withdrawal restrictions. . . . [They] also had notice of the facts brought out in the extensive state court litigation. . . . "

The pre-July 9, 1959 depositors have appealed from the district court's order of March 10, 1970.

**548**

### III

The appellants maintain that the procedure followed below denied them due process of law. The district court allegedly dispensed with a trial and admitted "evidence in wholesale fashion without foundation or opportunity" for the intervening defendants to object. Thus, there allegedly is no way to determine whether any single finding of fact or conclusion of law is supported by competent, material evidence.

On October 18, 1968, the district court had entered an order tentatively delineating the two classes but not determining priorities. The court then directed the parties to attempt to stipulate to facts pertinent to that issue. On January 23, 1969, the court, anxious to proceed speedily to a resolution of the cause, suggested that it was unnecessary to wait until the detailed stipulation was completed. It declared that "[i]t is apparent at this juncture that the determination of certain legal questions will expedite

the ultimate disposition of this seemingly unwieldy case and will properly fix the bounds of discovery which now appear endless." Accordingly, the court ordered each of the interested parties to submit a memorandum of law [3] addressed to the question: "Which, if any, class or classes of depositors are entitled to a preference as security holders as defined by the Supreme Court opinion in this case [Tcherepnin v Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)]?" It stated the parties would be permitted to file answering briefs. Thereafter, "the Court will take the matter of that determination without oral argument."

In so proceeding, the court purported to be following the "spirit and teachings" of the Manual for Complex and Multidistrict Litigation, particularly Sections 0.22 and 1.8.[4] "[I]t is obvious to me that we are here dealing with what the Judicial Conference of the United States refers to as a 'protracted' or 'complex' case."

---

3. The appellants maintain that the court ordered memoranda when it appeared "impossible" for the parties to agree to the facts. However, at the January 23, 1969 proceedings, the court gave the following reasons for not waiting until a full stipulation could be worked out:

"I want to proceed speedily. . . . I . . . comprehend that the facts to which you are asked to stipulate might enter the realm of conclusions, and also that actually the basis for all of the stipulation, if one could be agreed upon, is already before the Court. . . . Counsel have . . . advised the Court that substantial progress has been made toward filing a detailed stipulation. At the moment, however, progress on the stipulation and discovery in general has been slowed by the claimed unavailability of certain information, namely, the breakdown as to when each of the numerous depositors made his deposit and therefore into which class he properly falls. [Hence, it is necessary to resolve certain legal issues to expedite matters.] . . . The memorandum need not assume nor specify the number of persons in each class claimed to be a class of security holders, or the number of persons, if any, allegedly not possessing the rights of a security holder."

4. Section 0.22, "Classes of potentially complex cases," provides:

"Cases in the following classification may require special treatment in accordance with the procedures in this Manual: . . . (f) individual stockholders', stockholders' derivative, and stockholders' representative actions; . . . (j) class actions or potential class actions; or (k) other cases involving unusual multiplicity or complexity of factual issues."

Section 1.8, "Early Determination of Special Legal Questions," reads in part:

"In some complex cases it becomes apparent at the preliminary pretrial conference or shortly thereafter that the determination of a legal question will expedite the disposition of the cause. This is particularly the case where the nature and scope of discovery and further pretrial proceedings would be substantially affected by the determination of the preliminary legal question. . . . When desirable to expedite the cause, the court should provide an efficient method including discovery if desirable, and a time schedule for submission and determination of such preliminary legal questions."

After explaining the course to be followed, the court declared, *"this case is now on trial."* It then received in evidence (1) all documents and records in the custody of the receivers which were part of the files and records of CSA, (2) all accounting reports concerning the operations of CSA rendered either by Peat, Marwick, & Mitchell & Company or by Price-Waterhouse & Company, and (3) the complete transcript of the proceedings held on the motion for appointment of a receiver. The court clearly announced to the parties that they were free to comment on the evidence.[5] At the end of the January 23, 1969 proceedings, the court said:

"After such determination has been made, the Court will if then necessary enter an appropriate order specifying how the individual security holder may exercise his right to rescind the purchase of his securities, *and what if any proceedings are necessary to conclude the trial and enter final judgment.*

. . . . . . .

"Proceed with the preparation of your briefs, gentlemen.

*"Anything further?"*

The district court thus outlined for the parties how it intended to handle the case. The transcript shows no response to the court's query by counsel for the pre-July 9, 1959 depositors. Those investors made no objection to this form of trial procedure. In response to questioning during oral argument, their counsel told this court that they had never offered any evidence nor had they been denied the right to offer evidence. Counsel further informed us that the district court had been willing to review any pertinent evidence that the parties brought to its attention.

The pre-July 9, 1959 depositors did not object to the evidence admitted below.

Indeed, in their appellate briefs, they repeatedly concede the commission of the frauds charged in the plaintiffs' complaint.

■ In light of the above, we hold that the appellants were not denied due process of law.

The thrust of the appellants' substantive attack is that the division of depositors into two classes, one of which is entitled to a preference in CSA's liquidated assets, was arbitrary and inequitable. The pre-July 9, 1959 depositors emphatically contend that they *too* were victims of the same kinds of frauds of which the plaintiffs complain. Hence, the two classes allegedly are *in pari causa,* and neither has priority over the other. In essence, the appellants are contending that there is only one class.

The plaintiffs emphasize that not only did the appellants not originally formally plead a securities fraud cause of action under the 1934 Act, but they never amended their pleadings to assert the violation of federal rights. The district court found that "[o]nly plaintiffs and their class have properly pleaded a claim under the Federal Securities Law."

In response, the appellants marshal the following arguments: (1) they did not think it was necessary for them to file pleadings asking for rescission because they believed they were "under the umbrella of the court's equity powers," and, pursuant to those powers, the court "would protect all the depositor-shareholders"; (2) the named defendants, in perpetrating the frauds complained of, principally used the "perpetual proxies" that were obtained from all the depositors; and (3) the "exchange" after the 1959 cut-off date by many of the appellants of their pre-July 9, 1959 accounts for "new" accounts was a sale or transfer of securities.[6]

5. Specifically, the court stated:

"Any party desiring to refer to any of the said documents, recordings 'or reports in its memorandum or at any time may do so. The parties may present in their briefs any arguments as to the

relevance or probative value of any evidence here admitted."

6. CSA had established seven categories or types of withdrawable capital share accounts, four of which were in being prior to 1959 and three of which were estab-

The first argument seems to imply that preferences are per se "bad." Such a contention is negated by an amplitude of legislation and court decisions creating priorities and preferences and developing criteria for determining the proper persons to constitute a valid "class." The question before us is whether the district court erred in its application of these established legal principles. That is, the appellants' invocation of the judicial power "to do equity" does not relieve them of their obligation to show us how they come within the framework of the plaintiffs' pleadings, which alleged violations of Section 10(b) and Rule 10b–5. J. I. Case v. Borak, 377 U.S. 426, 84 S.Ct. 195, 11 L.Ed.2d 143 (1964), which the appellants cite, does not eliminate this requirement.

■ Underlying the second argument of the pre-July 9, 1959 depositors is the premise that the use by the named defendants of the permanent proxies to "perpetuate [their] power and ability to perform frauds, misrepresentations and concealments" is covered by Section 10(b) and Rule 10b–5. Those provisions involve the purchase or sale of a security. The solicitation of proxies or the giving of them or the failure to revoke a proxy is not by itself the purchase or sale of a security. Further, Section 14(a) of the Securities Exchange Act of 1934 and Rule 14(a) thereunder regulating proxy solicitation apply only to securities registered under Section 12 of the Act. Withdrawable shares such as those in CSA are exempt from such registration under Section 12(g) (2) (C) of the Act. The intervening defendants-appellants' reliance on Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed. 2d 593 (1970) is, therefore, misplaced.

The appellants' third argument is the heart of their claim that those pre-July 9, 1959 depositors who did exchange accounts come within the plaintiffs' class —that they also had federal rights violated.

Maintaining that those exchanges did not amount to new purchases, the plaintiffs characterize them as the illegal switching of accounts that were on a restricted withdrawal basis to ones free of such limitations. (Such switches allegedly violated state law.) We note that, during oral argument, counsel for the intervening defendants suggested that CSA's management had induced his clients to turn in their existing accounts for "new" ones by the representation that this would facilitate their right to withdrawal, that is, would enable them to come within the recent statutory amendment.

As the post-July 9, 1959 depositors point out, in addition to opposing originally the claim that the federal securities laws applied to CSA and to failing formally to pursue federal remedies, the pre-July 9, 1959 depositors contended in the district court "that those persons whose deposits were made prior to July 9, 1959, did not become members of the Plaintiff category by a mere change of passbook and nomenclature as to monies already on deposit." ["Motion for Examination of Accounts and Re-Alignment of Parties," filed November 13, 1968.] On this appeal, however, the appellants, in effect, urge us not to hold them to their previous omissions and contentions.

In support of their proposition that "the exchange of the appellants' class deposits to new accounts with the obtaining of new permanent proxies, subsequent to 1961, on false representations that this would enable the appellants to obtain their funds, was a purchase or sale of a security in which there was fraud and deception cognizable under § 10(b) of the Securities Exchange Act . . . and Rule 10 (b–5) [sic],"

lished after July 9, 1959, the date that the "new" provision permitting accounts withdrawable at will became effective. The four "old" types of accounts were subject to the restrictions imposed in

December 1957 by CSA's board of directors, acting pursuant to state law. The accounts first opened by the defendant-intervenors (the pre-July 9, 1959 depositors) were of the four restricted types.

the pre-July 9, 1959 depositors request us to consider SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed. 2d 668 (1969); Swanson v. American Consumer Industries, Inc., 415 F.2d 1326 (7th Cir. 1969); and Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 10 (1971). We do not find these cases dispositive of the issues raised on this appeal.

*National Securities, supra,* concerned a suit by the SEC alleging violations of § 10(b) and Rule 10b–5 arising out of misrepresentations and omissions of material facts in communications sent to shareholders of Producers Life Insurance Company in an attempt to secure approval of a merger between that company and an insurance firm controlled by National Securities. In reversing the dismissal of the complaint, the Supreme Court concluded that Producers' shareholders "purchased" shares in the new company by exchanging them for their old stock. It further found that Rule 10b–5 was applicable to the defendants' misstatements in their proxy materials. Judge Cummings of this court, in *Swanson, supra,* also relied upon by the appellants, well stated the "lesson" to be derived from *National Securities:*

> "It is no longer open to question that the exchange of shares in connection with a merger or sale of assets constitutes a 'purchase or sale' within the meaning of Section 10(b) and Rule 10b–5. SEC v. National Securities, Inc., 393 U.S. 453, 467–468, 89 S.Ct. 564, 21 L.Ed.2d 668. . . . The *National Securities* decision also makes clear that the fact that the vehicle for the accomplishment of a fraudulent

scheme may be proxy materials subject to regulation under Section 14(a) is not a bar to the application of the broad anti-fraud provisions contained in Section 10(b) and Rule 10b–5. 393 U.S. at p. 468, 89 S.Ct. 564. . . ." (415 F.2d at 1330.)

*Bankers Life* does not involve any alleged proxy frauds. It is factually inapposite to the instant case and does not support the proposition for which the appellants cite it.[7]

*National Securities* and *Swanson* do not show that the "exchange" that took place here was a "purchase or sale." Furthermore, even if we assume that a "purchase or sale" occurred, we fail to see how those pre-July 9, 1959 depositors who changed accounts, unlike the minority stockholders in *Swanson* or the shareholders of Producers Life in *National Securities,* worsened their situation by their action.

The parties disagree whether the exchanged-for accounts were subject to the severe restrictions on withdrawals to which the old accounts were subject. If the "new" accounts were not so limited, then the representations allegedly made to the appellants were true. That is, the pre-July 9, 1959 depositors who "switched" then did share whatever freedom of withdrawal the depositors who first invested in CSA after July 9, 1959, enjoyed. Also, the proxies executed after July 9, 1959, in connection with the opening of new accounts were similar to those "permanent proxies" to which the old accounts were subject. If the "new" accounts of the pre-July 9, 1959 depositors were, in fact, as severely limited as to withdrawals as the "old" accounts were,

---

7. The question before the Supreme Court in *Bankers Life* was whether the pleading of the petitioner, liquidator of Manhattan Casualty Company, stated a cause of action. The complaint alleged that the defendants (who included an officer of Manhattan) had induced the company, in violation of the federal securities laws, to sell a block of securities owned by it on the false representation that it would receive the proceeds of the sale. (The complaint alleged that after the sale of the securities for full value, the defendants misappropriated and diverted the proceeds to their own use.) Reversing the lower courts, the Supreme Court held that the pleading was sufficient to state a cause of action under § 10(b) and Rule 10b–5. Those provisions were broad enough to cover the transaction complained of because the corporation suffered injury as a result of deceptive practices "touching its sale of securities as an investor."

then those depositors were in no worse a position than they had been before they effected the exchanges.

As we have already mentioned, the section under which the plaintiffs made their claims refers to misleading omissions or misstatements of material facts "in connection with the purchase or sale of any security." The plaintiffs' complaint and the district court's order focus on frauds perpetrated during a period subsequent to the time that the group designated by the district court as the pre-July 9, 1959 depositors first made their investments. It seems clear that if the appellants' post-July 9 dealings with CSA did not constitute "a purchase or sale," [8] as the plaintiffs urge, then the appellants' criticisms of the findings of fact in this particular area are misdirected.

For example, the appellants challenge the following finding: "Extensive fraudulent mortgage loans were made since July 9, 1959 particularly in the Apple Orchard and Howie in the Hills developments. The insolvency of City Savings Association occurred primarily as a result of these loans." The pre-July 9, 1959 depositors refer to evidence that their funds were used in a fraudulent loan of $450,000 for the Apple Orchard development on May 8, 1959, that is, before the plaintiffs had invested in CSA. They claim that this reveals the illogic of differentiating among depositors, for all CSA investors were victims of the fraudulent loans.

The post-July 9, 1959 depositors contend, and we agree, that this argument fails to take into account the section of the 1934 Act under which the plaintiffs and their class pleaded. They had alleged that the misrepresentations and omissions in the advertising literature sent them after July 9, 1959 to June 1964 and which induced them to purchase CSA securities related to CSA's financial health. The $450,000 loan and *subsequent* improper loans contributed greatly to CSA's capital impairment. (The appellants do not dispute this.) The advertising inducing the plaintiffs and their class to invest in CSA did not inform them that fraudulent, capital-impairing loans had been made. The plaintiffs thus do what the defendant-intervenors arguably cannot do, namely, tie the May 1959 and later loans to fraudulent misrepresentations and omissions made in connection with the purchase or sale of a security. The specific loan to which the appellants advert as well, of course, as the subsequent loans were made after the appellants had been induced to invest in CSA.

In disputing the contention that the appellants come within the plaintiffs' class, however, the plaintiffs have assumed that only the opening of an account—the initial investment—is a purchase or sale of a security. Under Illinois law,[9] each depositor or account holder has a vote of one share for each hundred dollars or fraction thereof of the aggregate withdrawal value of his withdrawable capital account. Therefore, if any pre-July 9, 1959 account holder made new deposits after July 9 resulting in an increase in his voting shares, apparently he effected the purchase of a security. Also, if he opened an additional account after that date, a purchase of a security occurred.

Even if there are some appellants who fit within the above categories, however, that alone does not bring them within plaintiffs' class. The core of the complaint is that CSA's financial difficulties were concealed from the plaintiffs and their class at the time they were induced to invest in CSA. Those pre-July 9, 1959 depositors (including those who "switched" types of accounts, if we assume *arguendo* that the exchange was a "purchase or sale" of a security) could not have been defrauded as alleged in the complaint if they had had notice of CSA's troubles.

The validity of the class division established by the district court rests heavily

---

8. This is a problem that we find not necessary to resolve finally.

9. Illinois Savings & Loan Act, Ill.Rev.Stat. ch. 32, § 742(d) (2).

on the notice the pre-July 9, 1959 depositors allegedly had. The pertinent finding is:

"The defendant-intervenors and their class (*i. e.* pre July 9, 1959 depositors) had repeated public notice of the prior fraud and had actual knowledge of the limited withdrawal restrictions. Defendant-intervenors and their class also had notice of the facts brought out in the extensive state court litigation. . . ."

CSA was closed to depositors for eight months while the State was in custody, April to December 1957. Shortly after the State seized CSA, the institution's chief executive officer filed a suit to restrain such custody. A petition for leave to intervene was filed in that case, purportedly on behalf of about 7000 shareholders of CSA who belonged to a group called the Shareholders' Committee for the Reopening of City Savings Association and on behalf of all other CSA shareholders similarly situated. They were permitted to intervene because they "would or might be bound by the judgment which would affect them and . . . [because] there was no one in the case directly representing their interests." The state court decisions in the case in which the shareholders intervened discussed the problems facing CSA.

The plaintiffs claim that the pre-July 9, 1959 depositors are bound by the state court litigation; that is, they had notice of the facts there brought out because of the intervention. However, the appellants maintain that, absent a showing in the federal district court of notice to the pre-July 9, 1959 depositors that anything was being said or done in their names in the state court proceedings, the state litigation cannot be deemed to have given them notice of anything.[10] Presumably they would also deny that they knew or should have known that the State closed CSA in 1957.

However, we need not rely on the notice allegedly arising from the state court proceedings.[11] The record supports the finding that the pre-July 9, 1959 depositors had notice that pre-1959 accounts were on a restricted withdrawal basis—important information that CSA failed to supply when soliciting the business of the plaintiffs and their class. The imposition of restrictions on withdrawals indicated that CSA was in an unsound financial position. In so holding, we reject the appellants' claim that notice or knowledge is a purely subjective matter entailing the interrogation of each shareholder or at least of a random sampling of the shareholders. The appellants must be deemed to have looked at CSA in their dealings with it through lenses tinted with knowledge, whether constructive or actual.

The pre-July 9, 1959 depositors have raised other contentions on this appeal, including one which was first presented at oral argument. We have considered all these contentions and find them without merit. Likewise, we have found it unnecessary to consider countervailing arguments of the post-July 9, 1959 depositors, such as that claims by the intervening defendants of fraud are barred by estoppel, laches, res judicata, or the Illinois five-year statute of limitations.

In sum, we agree with the district court that there are two basic classes of depositors, that only one of them properly pleaded a claim under Section 10(b) of the Securities Exchange Act, and that that class is entitled to priority. We are unpersuaded that the appellants are within the framework of the plain-

---

10. The Circuit Court of Cook County relinquished jurisdiction over CSA by its final decree of February 3, 1959. Hence, as the plaintiffs argue, they and their class as post-July 9, 1959 depositors were not bound by the state court proceedings nor can knowledge of the State's taking custody in 1957 be attributed to them.

11. Nor do we rely on the extensive publicity which the appellants concede was accorded the affairs of CSA and of its prime moving spirit, C. Oran Mensik, during the last seven or so years that the institution's doors were open (and which did not necessarily abate when those doors periodically closed).

**554**

tiffs' complaint or that they are members of the plaintiffs' class.[12]

We modify the court's order regarding the class divisions, however, by including in the preferential class with the plaintiffs those investors in CSA who opened and closed accounts prior to April 25, 1957, the date the State first took custody of the institution and suspended payments to depositors, and who, after closing those accounts, did not open new accounts until after July 9, 1959. Because these depositors terminated their association with CSA before the handwriting was on the wall, they also were misled by CSA's failure to provide crucial information about the institution's financial instability.

As we have mentioned, the appellants do not really challenge the court's conclusion that the plaintiffs and their class have been defrauded. The substance of their attack on the court's order of March 10, 1970, is that the fraud findings are incomplete and should have included them. We do not share this view. We affirm the district court's conclusion that the plaintiffs and their class "have been defrauded within the meaning of the anti-fraud provisions of the Securities Exchange Act of 1934."

### IV

Although we uphold the district court's order entitling the plaintiffs' class to preferences in the assets of CSA, we, like the district court, are acutely aware of the suffering CSA's insolvency has caused many depositors in both groups. From the evidence presented below, we gather that, unfortunately, not

even the plaintiffs here, who were "successful in their federal suit," Tcherepnin v. Knight, 389 U.S. at 346, 88 S.Ct. 548, 19 L.Ed.2d 564, will survive the CSA debacle unscathed.

This case is remanded to the district court for further proceedings consistent with our decision.

Affirmed as modified.

---

12. The court's finding of fact that "Without the knowledge of the plaintiffs and their class, considerable funds deposited by them on or after July 9, 1959 were used illegally to make payments to pre July 9, 1959 depositors" was one factor leading to its conclusion that the appellants could not properly be considered members of plaintiffs' class. The appellants hotly contest the accuracy of the finding although they apparently did not object below to the evidence supporting it. Although we find it unnecessary to

reach this point, we note that in an affidavit submitted to the district court, CPA George Weisbard analyzed the pertinent financial records and concluded that "the pre July 24, 1959 depositors in substantial measure were paid out of the pockets of the post July 23, 1959 depositors."