**COLE ENERGY DEVELOPMENT COMPANY, a corporation, Plaintiff–Appellant,**

v.

**INGERSOLL–RAND COMPANY, a corporation, Defendant–Appellee.**

No. 89–1475.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1990.

Decided Sept. 13, 1990.

---

Harold M. Olsen, Nils A. Olsen, Olsen & Olsen, Springfield, Ill., for plaintiff-appellant.

Patrick V. Reilly, Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, Ill., Michael J. Roberts, Grand Rapids, Mich., for defendant-appellee.

Before WOOD, Jr., and FLAUM, Circuit Judges, and CRABB, Chief District Judge.[1]

CRABB, Chief District Judge.

This is an appeal in a diversity case arising out of a dispute about the effectiveness of gas compressors leased by defendant-appellee Ingersoll–Rand Company to plaintiff-appellant Cole Energy Development Company. Ingersoll is a manufacturer, seller and lessor of compressor equipment. It leased two gas compressors to Cole for the purpose of increasing production in a natural gas production facility which Cole operated and which is known as the Fishhook Field. The compressors failed to work as Cole thought they should. Cole sued for breach of contract, breach of express and implied warranty and fraud. The court found for Cole on the breach of express warranty claim after a bench trial and later determined the damages on the basis of affidavits submitted by the parties. We conclude that the district court erred in denying the parties a trial on damages and in calculating the amount of the damages to be awarded to Cole.

## FACTUAL BACKGROUND

Cole initiated the suit with allegations that it had entered into purchase option lease agreements with Ingersoll in December 1983 and August 1984 in reliance on Ingersoll's engineering expertise, Ingersoll's familiarity with Cole's requirements in the Fishhook Field, and Ingersoll's express representations that the leased compressors were new and would provide the capacity to pump a minimum of 1,700,000 cubic feet of gas a day. Cole alleged that the equipment Ingersoll provided was not new; that it was subject to failure and to breakdowns; that it never performed as promised; and that Ingersoll took a long time to provide repair parts and was willfully negligent in failing to provide the equipment and service specified in the leases. Cole asked for damages for its rental and transportation costs, wages for workmen left idle while repairs to the equipment were being made, for overtime wages, for the costs of labor and parts in attempting to keep the equipment operating, and loss

---

1. The Honorable Barbara B. Crabb, Chief Judge of the United States District Court for the Western District of Wisconsin, is sitting by designation.

of profits occasioned by Cole's inability to deliver gas it had contracted to sell.

Ingersoll denied that it had made any misrepresentations or breached any warranties. It alleged that it had performed repairs whenever they were needed, but that many of the repairs had been necessitated by Cole's poor maintenance and ineffective attempts to do its own work. Ingersoll contended that Cole was limited in its recovery to $64,200, the total of its lease payments, because the lease agreement specifically excluded consequential damages. In addition, Ingersoll counterclaimed against Cole for cancellation charges under the lease agreements.

Ingersoll filed a motion for partial summary judgment, contending that its contractual disclaimers of consequential damages and implied warranties were enforceable as a matter of law. The district court agreed and granted the motion, holding that even if Cole could prove a failure of a limited warranty to repair or replace defective parts, Ingersoll would not be liable for consequential damages because its leases expressly excluded such damages and allowing the exclusion was not unfair. 678 F.Supp. 208 (1988). The court found that the two parties were both sophisticated commercial enterprises of substantially equal bargaining strength; Cole had not alleged that Ingersoll was willful or dilatory in failing to meet its warranty obligations (assuming they were breached); and allowing the exclusion would not leave Cole without a remedy because it had its backup remedy of return of the payments made under the lease. The court ruled that defendant's damages were limited to the payments under the agreement, and dismissed plaintiff's claims for consequential damages. It also dismissed plaintiff's claim for breach of implied warranty on the ground that defendant had disclaimed such warranty conspicuously and with mention of merchantability, as required under Illinois law. The court then bifurcated the trial on the remaining claims and held a nine-day bench trial on the liability issues.

At the end of the trial the court made certain statements from the bench from which the following findings of fact can be distilled.

1. In the industry, a "new" compressor means a compressor that has never been used before, regardless of its age or the length of time it has been stored outdoors.

2. Cole is not a sophisticated enterprise.

3. No one from Cole ever realized that a "new" compressor meant one that was being put to use for the first time.

4. Ingersoll sold Cole a compressor that was five years old.

5. Ingersoll is a sophisticated enterprise.

6. Ingersoll's first proposal to Cole was a three unit package to increase production; the expense of this package was "too high," so Ingersoll proposed a booster to work with the equipment Cole already owned.

7. Ingersoll provides a single source warranty behind a whole package unit. It provided a single source warranty for the booster compressor.

8. Ingersoll made many attempts to get the leased machinery operating.

9. Ingersoll waived its requirement that warranty claims be in writing.

10. There is no evidence that the leased machines were not adequate as designed.

11. The machines did not work and when they did work they did not produce what Ingersoll said they would produce.

12. Ingersoll waived any right it had under the contract or otherwise to rely on the specifications and production surveys as designed.

13. Cole relied too heavily on self-help.

14. Ingersoll breached its express warranty.

In a written order issued the day after the trial, the court ruled that Cole had failed to prove fraud. It set aside its earlier ruling that the lease agreement excluded consequential damages, basing the reversal on its oral finding that Ingersoll had breached its express warranty and on the additional findings that Cole was not a sophisticated commercial enterprise as the

court had found earlier, but rather occupied a bargaining position substantially unequal to Ingersoll's, and that Ingersoll was "at least partially willful and dilatory in meeting its warranty obligations." *Cole Energy Development Co. v. Ingersoll–Rand Co.,* No. 86–3003, slip op. at 1 (C.D. Ill. June 9, 1988). Therefore, Cole was entitled to "actual and partial" consequential damages for Ingersoll's breach of the express warranty. *Id.*

The court put off the damage phase of the trial, and gave the parties a period of time in which to reach a settlement on damages and directed them to submit proof of damages through affidavits and damage summaries if they failed to settle. The court urged the parties strongly to settle:

Because neither one of you are pristine glories here and clean as hounds teeth. There is contributory negligence against and there is certainly on your part a failure to comply, I think, with the standard requirement, the industry standard requirements once you waive that strict express warranty defense that you had by your actions.

Now, if there is ever a time that you should get together—now Cole Energy is not going to get [its] difference between no production and two million a day. They are not going to get it. You never produced that before and just because the proposal comes from Ingersoll–Rand that we can do this up to two million, there's no performance at all yet. We don't know whether anything designed will bring the two million. And they are certainly not going to be paying two mill, up to two, whatever it is per day on that score. And we are going to have to do some balancing of the equities involved here.

They on the other hand you have under the contract, number one we are talking about cancellation costs. Number two, we are talking about non-payment of lease payments, and this type of thing. So there's got to be accounted in whatever we do finally.

So you've got both some pluses and you've got some minuses. And this is the time when you ought to resolve this.

And you can do, you can do it much more easily and better than I....

Trial transcript, June 8, 1988, at pp. 17–18.

The court did not give the parties an opportunity to object to having plaintiff's damages decided by affidavit. Neither party did so, then or at any later time.

In a subsequent written order in response to a motion by defendant for clarification, the court ruled that Ingersoll was entitled to cancellation charges and that Cole's entitlement to consequential damages did not mean it could recover "all consequential damages," or that it "was not required to mitigate those damages in some way." *Cole Energy Development Co. v. Ingersoll–Rand Company,* No. 86–3003, slip op. at 2 (C.D.Ill. July 8, 1988).

The parties were unable to settle the damage claims and proceeded to submit extensive materials bearing on those claims. The court did not require them to negotiate the precise issues on which they disagreed or to prepare proposed findings of fact and objections to focus their disputes, and the parties did neither of these things.

Despite the court's admonition that Cole was "not going to get [its] difference between no production and two million a day," Cole continued to maintain that it was entitled not only to the additional expenses it had incurred as a consequence of the defective machines, but to the profits it had lost in not achieving the production Ingersoll had warranted, in a total amount in excess of two million dollars. To support this claim, Cole submitted excerpts of testimony given during the liability phase by its employees, describing problems experienced with the Ingersoll compressors, and an affidavit of one of the employees summarizing the mechanical failures of the Ingersoll equipment and the resulting expenses. In addition, Cole filed an economic analysis prepared by a certified public accountant that explained the loss of profits as the difference between actual and anticipated revenue plus expenses attributable to equipment problems less regular, anticipat-

ed expenses, with present value determined by applying a rate of 10% for 36 months.

Ingersoll filed a study of Cole's operation of Fishhook Field by a natural gas and petroleum engineering consultant that purported to show that the field and compressor combination could never have produced two million cubic feet of gas a day between March 1984 and August 1985; that it was fair to attribute the non-production of 136,-137,000 cubic feet of gas to the problems with the Ingersoll equipment; and that this amount had not been lost but could be extracted from the field's reservoir at a later date. Ingersoll's expert accountant calculated the monetary effect of the postponement of revenues on the assumption that the production was not lost but merely deferred, and used interest rates reflecting the prime interest rate as reported in Federal Reserve Bulletins. Also Ingersoll filed documents showing that Cole had a 25% investment interest in the Fishhook Field and that other entities held the remaining interests.

In an order issued in January 1989, the district court denied Cole's claim for lost profits on the grounds that the claim was based on a rate of production unsupported by the evidence and that Cole had recaptured the profits eventually by taking the gas out of the field with other equipment. It denied Cole any damages for the time value of what Cole claimed to be its lost profits, holding that because Cole ultimately realized the profits underlying the present value calculation, the claim was nothing more than an attempt to collect prejudgment interest on the delayed profits, which was not permissible under Illinois law. In addition, the court found that Cole had only a 25% interest in Fishhook Field and was responsible for only 25% of the operating expenses.

The court reviewed Cole's list of additional, unanticipated expenses occasioned by the malfunction of the Ingersoll equipment. It disallowed a claim for $21,000 for a gathering system for a new booster, on the ground that this modification was necessitated by Cole's choice of a booster system instead of a three stage compressor. The court held that Cole could not recover for expenses incurred from choosing the system in the first place, but only for expenses incurred by a failure of the system to perform properly. The court disallowed $4,951 for insurance on the ground that Cole would have had this expense in any event. It disallowed a claim for $6,700 for repairs on the ground that the invoice showed that the repairs were for dirt in the engine, rather than for overloading or some other problem attributable to a flaw in the equipment. It denied as inadequately supported Cole's $2,000 claim for mileage and its $6,800 claim for rent payment.

Finally, the court denied Cole's claim for a loss of equity in the machinery on the grounds that Cole received $25,200 for its equity in one of the machines and, with respect to two other machines, gave up its right to equity by voluntarily terminating the leases on the machines rather than exercising a contractual option to purchase them, and also because the lost equity credit and lost rental payments would compensate Cole twice for the same injury. The court calculated the expenses attributable to Ingersoll's flawed equipment as $68,769. It set this as the total of Cole's damages.

The court then considered whether the damages should be reduced further on any of the grounds urged by Ingersoll: because Cole had failed to mitigate its damages; because the lease agreements included a loss limitation; or because Cole had only a 25% ownership interest in the Fishhook Field. The court concluded that Ingersoll had failed to carry its burden of proving that Cole had not mitigated its damages, and that no deduction was warranted because of any action Cole took or failed to take; that Cole could recover only 25% of the total economic loss, or $17,192.25, on the ground that a plaintiff is entitled to recover only its own loss and not that of others; and that the contractual provision limiting damages to the total of the rental payments made was inapplicable because Cole's damages of $17,192.25 were far below the $56,606.21 Cole had made in rental payments. The court made no reference to the cancellation charges, or to the return of Cole's rental payments.

## OPINION

### A. *Determination of Damages.*

■ The liability phase of this trial lasted nine days and involved a great deal of technical evidence about the production of gas and the use and operation of gas field production equipment. It is understandable that the trial judge would have preferred that the parties settle the issue of damages. When they did not, however, it was his obligation to try those questions that required resolution of disputed issues of fact.

■ It is true that trial judges have broad discretion over the manner in which they handle the cases before them, and that this court has upheld procedures that substituted for trial in certain situations. *See, e.g., Tcherepnin v. Franz,* 461 F.2d 544 (7th Cir.1972) (denying challenge to procedure in which court dispensed with trial on questions relating to classes of depositors entitled to preferences as security holders). It is true also that, although Cole complains vigorously in this court about the district court's failure to hold a trial on damages, it never raised any objection to that court about the procedure.

■ In many instances the litigant's failure to make its objection known to the court in time for the court to take corrective action will bar review of the disputed action. Litigants cannot withhold objections to use as trump cards in the event they lose on the merits. *See, e.g., Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970) ("party who chooses to gamble on that procedure [resolution of motion for preliminary injunction based solely on affidavits] cannot be heard to complain of it when the decision is adverse"). *See also Sims v. Mulcahy,* 902 F.2d 524 (7th Cir.1990) (party who did not ask for instruction advising jury it had to award at least nominal damages for violation of a constitutional right held to have waived right to raise that issue on appeal); *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1297 (7th Cir.1987) (party cannot challenge jury instruction on appeal if it failed to object at trial); *Int'l Travel-*ers Cheque Co. v. BankAmerica Corp., 660 F.2d 215, 223–24 (7th Cir.1981) (plaintiff could not argue on appeal that a party was not indispensable when it had admitted in the trial court that it was). Here, however, the error did not involve an evidentiary ruling, an admission by a party, a jury instruction, or a preliminary matter. It went to the heart of the truth-finding process. Courts have a basic obligation to try disputed issues of fact.

### B. *Findings of Fact on Liability.*

When the parties filed their affidavits, the court had not determined the exact nature of the warranty that Ingersoll was found to have breached, the consequent extent of Ingersoll's liability, including the reasonable foreseeability of Cole's losses, or whether Cole had failed to carry out its duty to mitigate its losses. Without resolution of these issues and with only limited findings of fact, the parties had no guidance in their settlement negotiations and in their subsequent submissions of damage evidence, and we have little understanding of a case that, according to the district judge, was "extremely factually oriented." Trial transcript, June 8, 1988, at p. 2.

Fed.R.Civ.P. 52(a) imposes on trial judges the obligation to "find the facts specially." "The trial judge's major responsibility is the finding of fact ..." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). *See also Nemmers v. United States,* 795 F.2d 628, 633 (7th Cir.1986) (in bench trials, Fed.R.Civ.P. 52(a) "requires the court to make findings of fact and conclusions of law on all material, disputed issues"); *Mucha v. King,* 792 F.2d 602, 605 (7th Cir.1986) (Fed.R.Civ.P. 52(a) "assigns to the trial judge the responsibility of determining not only the historical events that are relevant to how the case should be decided but also the legal significance of those events").

### 1. *Nature of warranty.*

■ In a product warranty case such as this, the threshold determination is the nature and scope of the warranty at issue.

That determination has to precede any finding of breach and necessarily establishes the basis for any subsequent damage calculation.

The parties do not dispute that their leases are covered by the Uniform Commercial Code, as adopted by Illinois. The Code provides that express warranties may be created as follows:

> Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

Ill.Rev.Stat. Ch. 26, § 2–313. Alternatively, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." *Id.* The seller's (or lessor's) obligations are determined by reference to the warranty it has given.

> For example, if the seller promises the buyer that "this pipe is ideally suited to high temperature environments," failure of the pipe to perform in such a special environment would breach an express warranty. If the seller had reason to know of the buyer's special needs, and the buyer was relying on the seller's expertise, the buyer might also be able to proceed on a warranty of fitness theory under Section 2–315 [of the UCC].

B. Clark & C. Smith, The Law of Product Warranties, par. 4.02[2], p. 4.6 (1984).

■ In its pretrial decision on defendant's motion for partial summary judgment, the court characterized the warranty at issue as limited to the repair or replacement of defective parts. Whether it reached the same conclusion following trial is not clear from its discussion in the decision on damages. Some of the court's comments suggest that it saw the warranty then as more extensive, perhaps as consisting of an express warranty that the equipment would perform to a particular standard and produce a minimum amount of gas. In other words, the court may have viewed the warranty as one of fitness for a particular purpose. There is a suggestion

to that effect in the court's reference to plaintiff's failure to prove that the leased equipment should have been able to produce the output of the anticipated production. Other comments in the court's oral ruling at the conclusion of the liability phase suggest that it viewed the warranty as a promise by defendant that it would deliver equipment in good working order free from defects.

On remand, the court should make explicit its findings about the nature and scope of the warranty and Ingersoll's liability. These findings should be entered well in advance of the trial on the damage phase, so that the parties will be able to plan their presentations accordingly.

### 2. *Damage issues.*

Some comments on the damage determination may be useful to the court and to the parties.

#### a. Loss caused by delay in production.

■ In calculating Cole's damages, the trial judge found as fact that Cole did not lose any gas production because of Ingersoll's breach, but that it was unable to produce the gas as fast as it had hoped. Although Cole disputes the finding and points out that it never had an opportunity to test it by cross-examination at trial, it has not pointed to any evidence to contradict the court's finding. We will assume for the purpose of this opinion that Cole never lost any actual production, although we agree with Cole that it lost the benefit of producing the gas as fast as it claimed Ingersoll had promised.

Assuming as we do that Cole was able ultimately to produce all of the gas in Fishhook Field and sell it for the same price it was receiving in 1984 and 1985, we agree with the trial court that Cole could not claim as damages the full amount of the profit it ultimately received on the delayed production. However, under the district court's finding that Ingersoll could not limit its damages, Cole could have claimed all of the incidental and consequential expenses it incurred because the Ingersoll equipment did not work as warranted and

caused Cole delay in the realization of its profits. *See* Ill.Rev.Stat., Ch. 26, par. 2–715(1) and (2) (defining incidental and consequential damages of buyer); *see also id.* par. 1–106(1) ("The remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed...."). Of course, Cole bears the burden of proving any of its damage claims to a reasonable certainty, B. Clark & C. Smith, The Law of Product Warranties, par. 7.07[3][a], pp. 7–73 to 7–74, although not to a mathematical certainty. *Burrus v. Itek Corp.*, 46 Ill.App.3d 350, 4 Ill.Dec. 793, 360 N.E.2d 1168 (1977).

We agree with the district court that Cole's damage submissions were difficult to follow and poorly supported and explained.[2] We trust that when the trial proceeds on the damage phase, Cole will have a better understanding of what it must establish to carry its burden of proof on damages.

■ Cole's incidental damages would be based on that portion of its expenses it would not have spent had it known that the equipment would not produce at full capacity, such as additional payroll, rental costs, debt service costs, etc. *See generally* White and Summers, *Uniform Commercial Code* 511 (3d ed. 1988) ("The courts have not been grudging in awarding damages under 2–715(1) provided the buyer's expenses were 'reasonably incurred' and 'incidental' to the seller's breach.").

Cole's consequential damages would include the lost opportunity cost it incurred because the profits were delayed. *See Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir.1985) ("[A] forgone profit from exploiting a valuable opportunity that the breach of contract denied to the victim of the breach fits more comfortably under the heading of consequential damages than of incidental damages."); *see also* White and Summers at 519 ("Many courts have indicated a will-

ingness to allow any recognizable loss as consequential damages, if such loss can be translated into monetary terms.").

■ The cost to Cole of not having money when it should have is not prejudgment interest, but an actual loss incurred by Cole. Although the allowance of prejudgment interest is intended to compensate a party for lost interest income over a period of time in which it was entitled to a certain sum of money but did not have use of it, that time period runs from the date of the breach to the date of the judgment. In this case, on the other hand, Cole is seeking interest income forgone during the period from the date upon which it should have extracted the last cubic foot of gas to the date upon which it did extract the gas. Unlike the time frame involved in calculating prejudgment interest, Cole's period is not defined by an intervening judgment. Rather, the time period at issue in this case is akin to that which elapses when a buyer breaches and a seller uses reasonable efforts to cover. *See Afram Export*, 772 F.2d at 1370 ("[Prejudgment interest] runs not from the date of breach to the date of cover but from the date of breach to the date of judgment...."); *see also North American Foreign Trading Corp. v. Direct Mail Specialist*, 697 F.Supp. 163, 166–67 (S.D.N.Y.1988) ("The Court thus decides that plaintiffs [sellers] would be entitled to recover interest at the statutory rate on the contract price ... from the date of breach until the time at which the seller could reasonably have resold the goods with reasonable effort for a reasonable price.").

The money Cole received sometime after August 1985 was not worth as much as that same amount would have been worth in March 1984. The difference is an economic loss to Cole. *See Fishman v. Estate of Wirtz*, 807 F.2d 520, 556 (7th Cir.1986) ("The economic concept of 'opportunity cost' has been used in a variety of cases as a loose label for any of a number of adjustments to value involving the idea that for

---

**2.** Cole compounded its failings in this court by not filing a complete copy of the trial transcript after it was ordered to do so, by not numbering the pages of its appendix and by not including in the appendix all of the documents relevant to its appeal.

every use of one's resources there is an alternative use, with its own return, foregone.").

■] In calculating its incidental and consequential damages, Cole must first establish the amount of gas that can properly be considered to have been delayed. It cannot do this without knowing what the warranty is. If it is that the equipment would produce as much as Cole claims it was promised, (and if Ingersoll is not excused from this warranty by any acts or omissions of Cole or any external factors that could not have been anticipated), then Cole could begin its calculations of damages by computing the difference between its actual costs and the costs it would have expected to incur had the promised production rate been accomplished. If the warranty was only to provide repairs and replacement parts promptly, Cole could use only the difference between the costs of its actual production and what it would have had to spend had the defendant responded promptly to Cole's requests for service. If the warranty was to provide equipment in good working order then Cole would be entitled to use the difference between the costs of its actual production and the costs it would have incurred had the defective equipment worked to its full capacity and not been out of operation for more than normal maintenance.

### b. Recovery of lease payments.

■ Whatever warranty Ingersoll made and breached, Cole was entitled to cancel the leases and recover the payments it made as well as interest on those payments. Ill.Rev.Stat. ch. 17, par. 6402. *Art Press, Ltd. v. Western Printing Mach. Co.,* 852 F.2d 276 (7th Cir.1988) (under Illinois law buyer can recover prejudgment interest on the total of its payments, since the amount of the payments is a fixed and determinable amount as of the date of rejection of the goods).

### c. Miscellaneous damage items.

With respect to the court's disallowance of specific expenses claimed by Cole, we have concerns about several of them. The court disallowed $6,700 spent for repair of an engine on the basis of an unsworn, unexplained invoice. It is not self-evident that the notation about dirt in the machine states the reason for the repair or a mere observation of the repairer, or that the infiltration of dirt is a problem attributable to Cole or to Ingersoll.

In disallowing the $21,000 claim for the gathering system modification, the district court noted that Ingersoll had asserted that the amount was for modifications to the existing piping system and was necessitated by Cole's choice of a booster system instead of a three stage compressor. The court held that Cole could not recover for expenses incurred from choosing the system in the first place. The court did not explain why it reached this result when it had found at the conclusion of the liability phase that Ingersoll was the sophisticated entity, Ingersoll had suggested the booster arrangement, and Ingersoll provided a single source warranty behind a whole package unit. There may well be good reasons for the denial of the claim, but they are not apparent on the present record.

■ The district court was correct in denying Cole any award for its claimed equity losses on the machinery it rented, because Cole chose not to exercise its option to purchase the equipment. However, we do not understand the court's statement that an award of the equity loss would constitute double-dipping because Cole had received the value of its equity loss on one machine by being given credit for rental payments on a replacement machine. Nothing in the record shows that Cole has been reimbursed for its rental payments.

### d. Ownership interest.

■ Finally, we turn to the court's reduction of damages by 75% to reflect Cole's 25% ownership of Fishhook Field. We find nothing in the record to justify this decision. Ingersoll dealt exclusively with Cole at all times. It looked only to Cole in negotiating the leases and when it filed its counterclaim for cancellation charges. Cole brought the action; it was the operating company and lessee under the leases;

and it alone entered into the contract with Central Illinois Public Service for the sale of the gas produced in the Fishhook Field. As sole signatory on the lease, Cole is entitled to 100% of the damages.

This case is REVERSED and REMANDED for the entry of written findings on the liability phase and for trial on the damages phase.